# Wytheville.

## CHARLES D. POWELL v. COMMONWEALTH.

### June 15, 1922.

1. HOMICIDE—*New Trial—After Discovered Evidence—Evidence that Principal Witness for Commonwealth Committed Perjury—Case at Bar.*— In the instant case, a trial for homicide, the trial court erred in refusing to set aside the verdict and grant a new trial on the ground of after discovered evidence disclosed by an affidavit, which, if true, showed that the testimony of the principal witness for the Commonwealth, on the vital question in the case, of whether there was provocation which justified the shooting, on which the verdict in large part must have been based, was perjured testimony.

2. NEW TRIALS—*After Discovered Evidence—Evidence Impeaching Character of a Former Witness.*—Newly discovered evidence to warrant a new trial must go to the merits of the case, and not merely to impeach the character of a former witness. But the newly discovered evidence which is considered as falling within the condemnation of this rule is confined to testimony to the bad character of the witness, or which tends to impeach the witness by disproving facts to which he has testified, by means of evidence of other inconsistent facts; of which consists merely in showing inconsistent statements of the witness made prior to the trial and not under oath.

3. NEW TRIALS—*After Discovered Evidence—Evidence Impeaching Character of a Former Witness.*—But where the newly discovered evidence consists of statements of the witness himself unquestionably made and made after the former trial, under circumstances which repel the idea that they are collusive, that is, designed to furnish ground for the motion for a new trial, and the statements, if true, are sufficient to show that the verdict was based on mistaken or perjured testimony, the rule that a new trial will not be granted upon after discovered evidence which merely impeaches the character of a former witness does not apply. Such evidence goes to the merits of the case, and this rule is the same at law upon an application for a new trial before judgment, as it is in equity upon a bill filed to obtain a new trial after judgment, on the ground of newly discovered evidence showing mistake, fraud, or perjury.

4. NEW TRIALS—*After Discovered Evidence—Perjury of Witness—General Rule.*—Where there is no reason to suspect certain testimony to be perjured, and no laches is shown, the courts will generally grant a new trial, if, after the trial, evidence of its perjured character is

discovered, and it is as to a material issue, or the verdict is based principally on such testimony. Thus where a material witness admits under oath that his testimony was mistaken or false, a new trial has in a number of cases been granted.

5. NEW TRIALS—*After Discovered Evidence—Perjury of Witness—General Rule.*—In granting a new trial upon after discovered evidence of perjury or mistake at the first trial, the courts act with great reluctance and with special care and caution. Where the ground is perjury, the old rule was that the witness .must appear of record to have been convicted of the perjury, or his death must have rendered conviction impossible. The modern rule is not so strict. If the court has evidence before it which establishes the existence of the evidence relied on to show the perjury or mistake in such a clear and convincing manner as to leave no room for doubt, and the court is satisfied that the evidence is not collusive, and ought on another trial to produce an opposite result on the merits, it is sufficient.

6. NEW TRIALS—*After Discovered Evidence—Perjury of Witness—Sufficiency of Affidavit.*—In the instant case the evidence in support of the motion for a new trial consisted of the statement of a witness on the former trial contained in an affidavit of an apparently reliable and disinterested person. The attorney for the Commonwealth introduced no counter affidavit, or other evidence to controvert the truth of the affidavit.

*Held:* That the court on appeal would presume the statement contained in the affidavit to be true.

7. NEW TRIALS—*After Discovered Evidence—Perjury—Sufficient Evidence after Elimination of Perjured Evidence.*—The general rule is that if, eliminating the perjured evidence, there is still other evidence sufficient to support the verdict, a new trial will not be granted.

8. NEW TRIALS—*After Discovered Evidence—Perjury—Sufficient Evidence after Elimination of Perjured Evidence—Case at Bar.*—In the instant case a new trial was asked for on the ground of after discovered evidence as to the perjury of a principal witness for the Commonwealth, widow of deceased, in regard to the provocation for the killing. A nephew of the deceased had given testimony to the same effect as the testimony of the widow and the verdict might have been found upon his testimony.

*Held:* That on account of their relationship, their association and their comparative ages, the court could not feel that the testimony of the nephew was wholly uninfluenced by that of the widow, and that the case did not fall within the general rule that a new trial would not be granted if, eliminating the perjured testimony, there was sufficient evidence to support the verdict.

9. NEW TRIALS—*Discretion of Court—Exceptional Cases—Perjury of Witness.*—Applications for new trials are addressed to the sound discretion of the court, and are based on the ground that there has not been a fair trial on the merits, and exceptional cases may arise

when the courts will find it necessary to depart from the general rule as to the granting or denial of new trials. In the instant case, however, in granting a new trial on the ground of newly discovered evidence as to the perjury of a principal witness, the ruling was not an exception to, but was in accord with the weight of authority on the subject.

Error to a judgment of the Circuit Court of Norfolk county.

*Reversed and a new trial granted.*

The accused, Charles D. Powell, was tried for the murder of John E. Wolford. The verdict of the jury found him guilty of murder in the second degree and fixed his punishment at eighteen years in the penitentiary. The judgment under review was entered accordingly.

The accused was convicted upon the testimony of Mrs. Wolford, the widow, and Johnny Burnham, a nephew of the deceased, about eighteen years of age, who were the only eyewitnesses of the homicide, other than the accused and his father. The widow and nephew testified as witnesses for the Commonwealth, and their testimony agreed in practically every detail. This testimony was directly in conflict with the testimony of the accused and his father as to the motive and provocation for the shooting of the deceased by the accused. The testimony of Mrs. Wolford, with which the testimony of the nephew concurred, was to the effect that, when the accused and his father, in a buggy, drove up in front of the house of the deceased and stopped, the father called, saying he wanted to see the nephew. That the deceased was then in the back yard cutting down brush with an axe, and called for the nephew, and said, "Some one wants to see Johnny." That the nephew was then sitting in the house and got up and went out towards the father of the accused, who had by that time gotten out of the buggy, leaving the accused sitting in it, and walked up to the yard

fence, somewhat to one side of the yard, and began to abuse the boy, and said he wanted to see Wolford, the deceased, and "the whole damn Wolford family." That the nephew turned off and said, "Uncle John, he wants to see you." That the deceased then came from the back yard, dragging along the axe he had been using, holding it by the end of the axe handle with his left hand, and went up and stopped inside of the fence within four feet of where the father of the accused was on the outside of the fence, standing against the fence, with a hand on a fence post; the fence being a five foot chicken wire fence between them, the back of the deceased being turned, not directly, but somewhat towards the accused as he sat in the buggy, a short distance away. That thereupon the father of the accused began to abuse the deceased, just as he had done the boy. That the deceased did nothing, "only leaned back on the axe as people use * * (a) cane," "resting on it in place of a walking stick." That after a few minutes the accused said: "Go ahead, pop, do anything, go ahead, and say anything, any damn thing you get ready, I am with you," and thereupon pulled out a pistol, and, from where he was sitting in the buggy, shot the deceased in the back, whereupon the deceased fell. That witness and the nephew helped the deceased into the house. That witness asked the two Powells to leave and they drove away together soon after the deceased had gotten in the house. That but one shot was fired, which entered the back of the deceased. That the deceased was taken to a hospital and died that night about 1 o'clock. That the shooting occurred about midday. That the deceased did not lift the axe, as if to strike a blow, before he was shot, but was leaning back on the handle of the axe when he was shot, holding it with his left hand near the end of the handle.

The testimony of the accused and of his father was to the effect that they were going to the blacksmith shop to have some work done on the buggy. That their route was along the road passing the home of the deceased. That as they drew near the house they saw the nephew of the deceased, at the shed at the back premises of the deceased. That the father, "feeling a little sick," called to the boy, with the object of getting him to bring him a drink of liquor. That the boy acted as if he had hurt his hand, and instead of coming out to the road walked back of the dwelling house, shaking his hand. That they drove on a little past the front of the dwelling house, when the boy appeared on that side of the house, and called to them. That the buggy was then stopped, the father got out to talk quietly to the boy, telling him he wanted a drink. The father testified that he had been accustomed to buying liquor of the boy, had gotten it from him many times, six or eight times, not at this place, but the boy would bring it to him. That as witness was talking to the boy, the deceased came from behind the house with the axe held about half way of the handle in one hand. That witness thereupon said to the boy, "Johnny, you have got so peppery out there about the shed I reckon I can do better business with your uncle than I can with you and you need not come." That the deceased came right up in front of witness, who "told him that he was sick and felt like a little something to drink would do him good," and asked the deceased if he "could accommodate him." On this subject the further testimony of the father is as follows: "He (the deceased) says, 'I have got nothing like it.' I says, 'John, you say you haven't any?' And he said, 'I have not anything like that and never have.' I said, 'I know you have been making whiskey.

I have been in 100 yards of your still there at the hog-pen,' and he said, 'You are a damn liar,' and I said, 'You are another damn liar,' and he come up with his axe and said, 'I will bust your brains out,' and I threw up my hands to defend my head from the axe and the gun'' (pistol) ''went off.'' That when the deceased raised the axe the pistol fired. That the fence at that place was ''staked down,'' so that it was only about a foot high between him and the deceased, and that the two were only about eighteen inches apart, at the time the axe was raised and the shooting occurred.

The accused testified that he did not know of any prior difficulty or unfriendly feeling whatever between his father and the deceased and was under the impression that they were on good terms. That nothing was said between the witness and his father about stopping at the home of the deceased until his father saw the nephew of the deceased. Then he heard his father speak to the deceased about a drink as the latter came up to the fence and heard the deceased say ''that he didn't have any or had not had any.'' That ''they had several words of that description * * and that when Wolford got within a very short distance of my father, * * he told my father he would bust his brains out or something similar.'' That witness was between twenty and thirty feet away, sitting in the buggy. That the deceased, with the axe, was in striking distance of the father of the witness. That witness was not close enough to have gotten to the deceased in time to have averted the threatened blow with the axe. That, therefore, when he saw the deceased raise the axe and make the threat aforesaid, he shot him, to keep him from striking his father. That this was his sole reason for the shooting. That he was on perfectly friendly terms with the deceased. He

denied that he and his father had ever discussed with each other the matter of whether or not the deceased had reported to the officers that there was a still on the father's farm, and also denied that he (the accused) went to the house of the deceased the day of the homicide for the purpose of taking that matter up with the deceased.    The father of the accused, on being recalled, also made a similar denial.

The accused, in his testimony on the trial, also denied that, in his examination before the judge, on application for bail, when he gave himself into the custody of the judge on the same day as the shooting, he stated that he and his father went down to Wolford's on the day of the homicide to see him about a still; saying that what he did say was the same in substance as that stated in his testimony on the trial, namely, that his father "spoke to Johnny about some whiskey, and this trouble came up when father told them about a still.    The still was back of Mr. Wolford's place and pretty close to the hogpen."

Two near neighbors of the deceased, one living diagonally across the road from the dwelling house of the deceased, impeached the testimony of the widow and nephew for the Commonwealth on the subject of the fence being five feet high between the deceased and the father of the accused at the place at which they were when the shooting occurred; and substantially corroborated the testimony of the accused and his father to the effect that it was staked down very low at that place.

In rebuttal, the Commonwealth introduced the deputy clerk who testified that, on the occasion above referred to, when the accused was being examined before the judge on application for bail, the accused made the statement "that he and his father drove

down to Wolford's upon the occasion in question to see him in regard to a still. * * that he (Wolford) insisted on running a still back there, * * that accused added, 'You know, your honor, we have had enough trouble about this still business,' that that was the recollection of witness what the conversation was."

Whereupon the accused introduced his two sisters, who were present on the occasion last referred to of the application for bail, who testified that the accused did not make the statement testified to by the deputy clerk, but, in substance, corroborated the testimony of the accused on that subject.

Thereupon counsel, who was assisting the attorney for the Commonwealth in the prosecution of the case, stated, in the presence of the jury:

"I will ask that his honor be sworn,"—the judge presiding at the trial being the same judge mentioned above to whom the application for bail aforesaid was made.

Whereupon the judge said: "I decline to be sworn." Thereupon the attorney for the Commonwealth said: "I do not join in the request."

No exception on the part of the accused was taken thereto at the time of this occurrence, so far as the record discloses, but it is made the basis of one of the assignments of error.

Upon the return of the verdict above mentioned, the accused, by counsel, moved the court to set it aside on several grounds, of which it is necessary to say only this: None of such grounds included the occurrence last mentioned of the calling upon the presiding judge to be sworn as a witness and his declining to do so; but among the grounds was the following: "Because of newly discovered evidence."

The record shows that no evidence in support of the

motion for a new trial, because of after discovered evidence, was produced before the court at the time of such motion; but that "before the argument on the motion for a new trial he introduced certain. affidavits of facts which he could not have discovered by due diligence on his part before his trial, which said affidavits are in the words and figures as follows, to-wit:"

Among these affidavits is one of one of the neighbors of the deceased, who testified as a witness for the accused on the trial on the subject of the height of the yard fence at the location where the deceased and the father of the accused were when the homicide occurred, and, omitting the formal parts, the affidavit is as follows:

"That on the morning of November 25, 1920, the next day after the trial of Charles D. Powell for murder of John E. Wolford, in the Circuit Court of Norfolk county, about 8 o'clock a.m., I went to the house of Mrs. Fannie Woolford, widow of the said John E. Woolford, to pay for some corn I had purchased from John Burnham, Mrs. Wolford's nephew, I saw Mrs. Wolford and had some conversation with her; during that conversation I said to her that Charlie (meaning Charles D. Powell) got a hard deal yesterday; to which she, Mrs. Fannie Woolford, replied: 'He did not get half enough, and if it had not been for the lies told by Luther Flemming, he would have got what he deserved, but we will get the old man, who should have been killed long ago.   The old devil has had my niece running over to his place for a year trying to ruin her. If Woolford had got him with that axe he would have got what he ought to have had, and he would have got him if it had not been for Charlie.'

"The above statements were made to me by Mrs. Fannie Woolford."

No affidavit, or other evidence, was introduced in behalf of the Commonwealth to rebut the evidence of the affidavit copied above. The court, however, over-ruled the motion for a new trial and entered the judgment under review.

*J. L. Broudy* and *John W. Happer*, for the plaintiff in error.

*John R. Saunders, Attorney-General; J. D. Hank, Jr., Assistant Attorney-General*, and *Leon M. Bazile, Second Assistant Attorney-General*, for the Commonwealth.

SIMS, J., after making the foregoing statement, delivered the following opinion of the court:

In the view we take of the case, it will be necessary for us to consider only one of the assignments of error, namely:

[1] 1. Did the court err in refusing to set aside the verdict and grant a new trial on the ground of the after discovered evidence disclosed by the affidavit above quoted, which, if true, shows that the testimony of the principal witness for the Commonwealth, on the vital question in the case, of whether there was provocation which justified the shooting, on which the verdict in large part must have been based, was perjured testimony?

This question must be answered in the affirmative.

[2, 3] The general rules governing the subject of granting a new trial are well settled. *Barsa* v. *Kator*, 121 Va. 290, 93 S. E. 613, and authorities cited. The newly discovered evidence in question meets all of the requirements of these rules, unless it be the requirements of the fifth and last rule, on the subject of what must be the character of the newly discovered evidence,

namely: that it "must go to the merits of the case and not merely to impeach the character of a former witness." With respect to the meaning of this rule, the following must be borne in mind:

It appears from the decisions on the subject that the newly discovered evidence which is considered as falling within the condemnation of the rule just mentioned, is confined to testimony to the bad character of the witness, or which tends to impeach the witness by disproving facts to which he has testified, by means of evidence of other inconsistent facts; *Thompson's Case*, 8 Gratt. (49 Va.) 637; *Brugh* v. *Shanks*, 5 Leigh (32 Va.) 598; *Brown* v. *Speyers*, 20 Gratt. (61 Va.) 296; *Read's Case*, 22 Gratt. (63 Va.) 924; *Cody* v. *Conly*, 27 Gratt. (68 Va.) 313; *Gillilan* v. *Ludington*, 6 W. Va. 128, 145; *State* v. *Betsall*, 11 W. Va. 703; *Hall* v. *Lyons*, 29 W. Va. 422, 1 S. E. 582; *Carder* v. *Bank*, 34 W. Va. 41, 11 S. E. 716; *Bloss* v. *Hull*, 27 W. Va. 503; *Livingston* v. *Hubbs*, 3 Johns. Chy. 124; or which consists merely in showing inconsistent statements of the witness made prior to the trial and not under oath; *Shields* v. *State*, 45 Conn. 266; *Arwood* v. *Slate*, 59 Ga. 391; or merely the bias of the witness; *Com.* v. *Waite*, 5 Mass. 261; *Hammond* v. *Wadhams*, 5 Mass. 353; *Com.* v. *Drew*, 4 Mass. 391; *State* v. *Carr*, 21 N. H. 166, 53 Am. Dec. 179; and the general rule is that a new trial will not be granted where the newly discovered evidence is of any of the kinds mentioned. This is declared by the authorities to be a rule of policy, intended to secure care and vigilance and prevent parties from coming forward subsequently with evidence which close investigation would have disclosed at the time; for it is said that a failure of justice in a particular instance is not so great an evil as that there should be no certain end to litigation. 1 Barton's Chy. Pr. 46-7.

But where the newly discovered evidence consists of statements of the witness himself unquestionably made and made after the former trial, under circumstances which repel the idea that they are collusive, that is, designed to furnish ground for the motion for a new trial, and the statements, if true, are sufficient to show that the verdict was based on mistaken or perjured testimony, a different situation is presented; and the weight of authority seems to be in favor of the view that such evidence is not within the category of evidence which falls within the condemnation of the aforesaid rule, but goes to the entire destruction of the evidence on which the verdict was founded, by showing that it was based on mistake or perjury; so that, in reality, because of this, the case has never been tried on its merits, and, hence, such newly discovered evidence goes to the merits of the case; so that in such a case a new trial should be granted. And this rule is the same at law upon an application for a new trial before judgment, as it is in equity upon a bill filed to obtain a new trial after judgment, on the ground of newly discovered evidence showing mistake, fraud, or perjury. *Fabrilius* v. *Cock*, 3 Burr. 1771; *Peagram* v. *King*, 9 N. C. 605; *Gillilan* v *Ludington, supra* (6 W. Va. 128); *Fletcher* v. *People*, 117 Ill. 184, 7 N. E. 80; *Mann* v. *State*, 44 Tex. 642; *Dennis* v. *State*, 103 Ind. 142, 2 N. E. 349; *State* v. *Powell*, 51 Wash. 372, 98 Pac. 741; *Bussey* v. *State*, 69 Ark. 545, 64 S. W. 268; *State* v. *Moberly*, 121 Mo. 604, 26 S. W. 364; 20 R. C. L. sec. 80, p. 299, and authorities cited.

*Fabrilius* v. *Cock, supra* (3 Burr. 1771), was an action of trover, in which a verdict had been given for the plaintiff for 2400 pounds, at *nisi prius*, before Lord Mansfield. The defendant moved for a new trial, upon the ground "that the whole was a fiction,

supported by perjury, which he could not be prepared to answer. That since the trial many circumstances had been discovered to detect the iniquity and to show the subornation of the witnesses." The report of the case states that the court, "after a very strict scrutiny * * granted a new trial." This action of the court was affirmed by the Court of King's Bench.

In *Peagram* v. *King, supra* (9 N. C. 605), a bill in equity was filed, seeking a new trial of an action at law, in which the verdict was based on the testimony of a witness, Jenks, who subsequently to the trial, during his last illness, confessed that he perjured himself in the testimony given by him on the trial, being incited thereto by the promise of a bribe from the defendant. The court, in the course of the opinion, says: "It is in general true, both at law and in equity, that a new trial will not be granted on the ground of newly discovered evidence, where it goes merely to impeach the testimony of a witness at a former trial, or to let in cumulative evidence as to matter which was principally controverted at the former trial; but that is very different from newly discovered evidence, which goes utterly to destroy the former testimony and cut it up by the root, by showing that it was founded in perjury. Accordingly, both courts furnish instances of a new trial being granted for the latter cause." After citing cases, the opinion continues as follows: "No evidence could have been given of the dying declarations of Jenks, wrung from him in an agony of remorse, when he had no motive to misrepresent; * *. It is admitted (Prec. in Chan. 193), that if a witness, on whose testimony a verdict has been given was convicted of perjury, a new trial may be granted. The death of Jenks, before the complainant knew by what witness his declaration could be shown, rendered a prosecution

48

impossible, and brings the case within the reason of the decision." The court decided "that a new trial be had in the court whence the case at law came   *   *."

[4] In 20 R. C. L., *supra* (sec. 80, p. 299), this is said: "Where there is no reason to suspect certain testimony to be perjured, and no laches is shown, the courts will generally grant a new trial, if, after the trial, evidence of its perjured character is discovered, and it is as to a material issue, or the verdict is based principally on such testimony. Thus where a material witness admits under oath that his testimony was mistaken or false, a new trial has in a number of cases been granted."

It is true that courts of the highest authority have taken the view, at least in civil cases, that a judgment or decree, although obtained by false swearing, will not be set aside, unless the fraud is extrinsic or collateral to the matter tried by the first court. See *McClung v. Folks*, 126 Va. 259, 101 S. E. 345, and authorities cited. What is fraud extrinsic or collateral, was thus defined by the court below in the case of *United States v. Throckmorton*, 98 U. S. 61, 25 L. Ed. 93: "Keeping the adversary's witness from court; secreting or purloining his testimony; or any conduct of the kind mentioned (which) would tend to prevent a fair trial on the merits, and thus to deprive the innocent party of his rights. So if a judge sits when disqualified from interest or consanguinity; if the litigation be collusive; if the parties be fictitious; if real parties affected are falsely stated to be before the court." This definition is in substance approved by the holding of the Supreme Court in the case, as set forth in the learned and instructive opinion delivered by Mr. Justice Miller. It would seem, however, that the doctrine of intrinsic and extrinsic fraud is, after all, not much, if at all,

different from the rule of policy above referred to, which refuses a new trial on the ground of after discovered evidence, where the evidence is of the character mentioned above as falling within the condemnation of the fifth rule on the subject of granting of new trials on the ground of after discovered evidence, other than proof of perjury or mistake, where such proof has come into existence after the former trial. The latter character of proof tends to show that no fair trial on the merits has been had. It is matter not suspected to have existed, and so impossible to have been considered or to have been "matter tried by the first court" which the courts have in mind which adhere to the intrinsic and extrinsic fraud doctrine. (See opinions of Chief Justice Shaw in the leading case on the latter subject of *Greene* v. *Greene*, 2 Gray (Mass.), 361, 61 Am. Dec. 454.) Hence, the granting of a new trial on the ground of proof of perjury or mistake, where the evidence of it has come into existence since the former trial, and appears to be true, not to be collusive, and ought, if true, to produce a different verdict on a new trial, does not violate the doctrine just mentioned.

[5] It is further true, however, that even within the narrow limits of the class of cases in which, by the weight of authority, a new trial should be granted for after discovered evidence of mistake or perjury, the courts act with great reluctance and with special care and caution. The courts properly require that it shall be made to appear affirmatively that the new evidence tending to show the mistake or the perjury, beyond question exists and is not a mere matter of belief or opinion, before they will grant the relief in such cases. Where the ground is perjury, the old rule was that the witness must appear of record to have been convicted of the perjury or his death must have ren-

dered conviction impossible, before it could be regarded as good ground for the new trial.   20 R. C. L., sec. 80, p. 300.   The modern rule is not so strict.   By the preponderance of authority it seems to be sufficient if the court has evidence before it which establishes the existence of the evidence relied on to show the perjury or mistake, in such a clear and convincing manner as to leave no room for doubt as to the existence of the evidence so relied on, and the court is satisfied that the evidence is not collusive, that it seems to be true, and ought, if true, to produce on another trial an opposite result on the merits.

[6] In the case in judgment the evidence in support of the motion for a new trial consists of the statement of the witness on the former trial contained in the affidavit of an apparently reliable and disinterested person.   The attorney for the Commonwealth introduced no counter affidavit, or other evidence, to controvert the truth of the affidavit.   That being so, we must hold, on the case as presented to us, that the statement contained in the affidavit is true.

As held in *Piper* v. *State, supra* (57 Tex. Cr. R. 605, 124 S. W. 661): "Where the affidavit, in support of the motion for a new trial on the ground of newly discovered evidence, averred facts with great particularity, so that the State could easily meet it had the facts been untrue, and there was no attempt by the State to meet it, the court, on appeal, will presume that the matters are correctly stated in the affidavit." The same is true in the instant case.

The material fact, stated in the affidavit aforesaid, is that the widow of the deceased, the day after the trial which resulted in the conviction of the accused, made a statement which bears internal evidence that it was not collusive,—that is, was not made to serve as the

ground for a new trial of the accused—in which she said, in substance, that the father of the accused would have been struck by the deceased with the axe and thereby killed or received great bodily harm, but for the shooting of the deceased by the accused; that is to say, that the shooting was done by the accused in the necessary defense of his father and in order to save him from becoming the victim of a felony about to be committed by the deceased which was imminent and evidenced unmistakably by an overt act. This is in direct conflict with the testimony of this witness on the trial. And as, upon the record before us, we must regard it as true that she made this statement, we are forced to the conclusion that the testimony on the trial of the witness in question, upon this vital feature of the case, appears to have been willfully false.

[7, 8] It is true that there was before the jury the testimony for the Commonwealth of the boy, the nephew of the deceased, to the same effect as the testimony of the widow, on which the verdict might have been found. And the general rule is that if, eliminating the perjured evidence, there is still other evidence sufficient to support the verdict, a new trial will not be granted. 20 R. C. L., sec. 80, p. 300. But that is where the court can fairly conclude that the jury in such case would have come to the same conclusion had the perjured testimony been eliminated. We are unable to reach that conclusion in the case in judgment. On account of their relationship, their association and their comparative ages, we cannot feel that the testimony of the boy was wholly uninfluenced by that of the widow. And in view of the statement of the latter, disclosed in the affidavit aforesaid, the case is one in which the newly discovered evidence indicates the existence of a purpose on the part of the

widow to procure the conviction of the accused upon fabricated evidence. This, if true, ought to produce on another trial an opposite result on the merits, and brings the case within the principle of the holding of this court in *Johnson's Case*, 104 Va. 881, 52 S. E. 625.

[9] In the case just cited the newly discovered evidence concerned, indeed, facts of which evidence existed prior to the trial, some of which the accused by the exercise of due diligence might have discovered prior to the trial, as appears from the evidence itself, the affidavit of the accused to the contrary notwithstanding. And that case is regarded as an exception to the general rule in that feature of it. Burks' Pl. & Pr. (new ed.), p. 556. As said, however, on the same page of the valuable work just cited: "Applications for new trials are addressed to the sound discretion of the court, and are based on the ground that there has not been a fair trial on the merits." And, after stating what is said to be the general rule on the subject, the same authority adds this: "Exceptional cases may arise when the courts will find it necessary to depart from it." The authorities generally agree with this view. But in granting a new trial upon the ground that the newly discovered evidence, if true, indicated a purpose on the part of a principal witness for the Commonwealth "to compass the conviction of the accused upon fabricated evidence (which newly discovered evidence) would reasonably have exerted a favorable influence with the jury in his behalf," as was done in that case, we believe that the ruling was not an exception to, but was in accord with the weight of authority on the subject.

A new trial will, therefore, be granted.

We will add, however, that what we have said above

must not be understood as deciding that the witness in question did in fact make the statement contained in the affidavit aforesaid, or, if she did, that she may not be able to give some satisfactory explanation of it consistent with the veracity of whatever may be her testimony on the new trial; nor that a jury may not be warranted in convicting the accused upon the other testimony in the case, with that of the widow eliminated, if such should be the situation upon a new trial. The whole subject will be at large and open to full investigation upon a new trial, and what we have said in this opinion as to the credibility of the testimony should not be stated before or allowed in any way to affect the jury upon a new trial.

*Reversed and a new trial granted.*