56 P.(2d) 1130

**STATE v. HENNEMAN.**

No. 4164.

Supreme Court of New Mexico.

April 13, 1936.

O. P. Easterwood, of Clayton, R. E. Underwood, of Amarillo, Tex., and Hugh B. Woodward, K. Gill Shaffer, and Frederic C. Blake, all of Albuquerque, for appellant.

Frank H. Patton, Atty. Gen., and Edward P. Chase, Asst. Atty. Gen., for the State.

HUDSPETH, Justice.

A. A. Henneman, Ruben Arellano, Ruben Mares, and Roy Overbay were charged with having, on the 15th day of June, 1933, in the county of Union in this state, unlawfully conspired to burn a grain elevator in Frederick, Okl. Mares and Overbay entered pleas of guilty. On a plea of not guilty, Henneman and Arellano were found guilty by a jury, and from the judgment and sentence of from five to seven years in the penitentiary, entered September 8, 1934 Henneman prosecutes this appeal. On the recommendation of the jury Arellano was given a suspended sentence.

Appellant established his business in Clayton, Union county, N. M., in the year 1922, and resided there until about the year 1928, when he moved to Amarillo, Tex., which became the headquarters for his seed and grain business.

Ruben Arellano entered appellant's employ in 1922, and continued in his employ as foreman of the Clayton elevator until the time of the trial.

The defendant Ruben Mares, a resident of Clayton, N. M., was an ex-convict. He was sent from Clayton to the New Mexico penitentiary, and he had also been an inmate of the Colorado penitentiary.

According to Mares' testimony, the defendant Arellano early in the month of June, 1933, offered to pay him $200 and take him to Frederick, Okl., if he (Mares) would burn an elevator which appellant Henneman had there and which was insured for $35,000. A few days later, defendant Arellano called at the home of Mares about 4 o'clock a. m. and they went in Arellano's car to Amarillo, Tex., where they talked to appellant. Mares testified: "He asked me if I had the nerve to burn it and keep quiet."

After driving 15 miles beyond Amarillo, Arellano proposed that Mares go alone to Frederick. They returned to Amarillo where Mares boarded a train. After visiting Frederick, locating the elevator and looking the ground over, Mares returned to Clayton and demanded $800 additional. His testimony regarding a conversation held in Clayton some days later, and about a week before the elevator was burned, follows:

"Q. After Henneman came in, did you hear or take part in any conversation, or did you overhear any conversation between the defendants Henneman and Arellano? A. No. They just told me that they would pay me the $800.00 if nothing happened after the elevator was burned.

"Q. Who made those statements to you, Mr. Mares? A. Both of them.

"Q. Both of these defendants, Mr. Henneman and Mr. Arellano? A. Mr. Arellano and Mr. Henneman.

"Q. What did you do after you had that conversation with them? A. Then I invited Roy Overbay to go with me.

"Q. To go where with you? A. Frederick, Oklahoma, to burn the elevator.

"Q. Did you and Roy Overbay go to Oklahoma then? A. Yes. We both went. * * *

"Q. What did you and Mr. Overbay do after you got to Frederick, Oklahoma? A. We took the necessities to start the fire, some old car tires and a quart of gasoline.

"Q. What did you do with all of that? A. We took it inside and we took them into a place where they call them the legs, where they told me to start the fire.

"Q. Tell this court and jury what you did there. A. We started a fire, and as soon as we start the fire we come back to Vernon.

"Q. When you came back to Vernon, did you see Cogdill again? A. Yes. We find Mr. Cogdill there, and we come back to Clayton, and about a week later after I come back from there Mr. Henneman paid me $200.00.

"Q. Where did he pay you the $200.00? A. In this granary here in Clayton.

"Q. At the time the money was paid to you, was Mr. Arellano present? A. Yes. He gave him to him and he paid me in his presence.

"Q. What do you mean 'he gave him to him and paid me in his presence'? Give the names. A. Mr. Henneman gave the $200.00 to Arellano and Arellano passed to me $170.00.

"Q. Why didn't he give you the $200.00? A. Because he claimed that I owe him $25.00 for expenses that he made himself.

"Q. Did you owe him $25.00? A. He claimed that I owe him for expenses that he made.

"Q. Expenses that he made where? A. For the ticket that he bought me from Amarillo to Vernon and some other small amount that he give me for expenses.

"Q. That is in connection with your first trip to Frederick? A. Yes, sir."

Some time after the burning of the elevator, Mares and Overbay talked of the crime while drinking in the presence of a bootlegger named Dacy. Later, in the month of August, 1933, Overbay and Dacy, who assumed the name of Cisco, went to Amarillo and endeavored to extort money from appellant. Overbay testified that appellant called Arellano at Clayton by telephone while he was in his office for the purpose of ascertaining what Overbay knew about the fire. Appellant positively denied calling Arellano on that day or on any other day, although his bookkeeper in the Clayton elevator testified that he had twice called for Arellano within the week ending June 15, 1933.

Mares was demanding money of Arellano and delivered a letter to him which he claimed was received from his advisor, the purport of which was that Mares should make demand on appellant through Arellano, and if appellant failed to meet the demand that the insurance company would pay liberally for the information. Finally, Arellano sent Mares $15 by Mares' brother, according to the state's witnesses. While Arellano admitted delivering the $15 to Mares' brother, he claimed it was a loan to the brother.

Mares also tesified that he met by appointment appellant and Arellano near a school building in Clayton a short time before he was arrested, and before the $15 was sent to him by Arellano, at which time he notified them that he would go back on his word unless they gave him money. Later, appellant sent his employee Acres to Boise City, Okl., to get a statement from the defendant Mares. Two days later Mares made a different statement in the presence of Oklahoma officers. Appellant testified with reference to this point as follows:

"Q. You also had in your employ, did you not, a man named Virgil Acres? A. Yes, sir.

"Q. He was in your employ right after the Frederick elevator fire? A. Yes, sir.

"Q. He was one of these men up there at Boise City that got the statement from Rube Mares? A. Yes, sir.

"Q. He was in your employ at that time? A. Yes, sir.

"Q. Now then, do you know of any reason in the world why it was that this boy Roy Overbay and this man that termed himself Cisco should happen to come down to Amarillo to see you? A. There is quite a lot of blackmailing going on these days and people looking for easy money without working for it, and my idea in getting Mr. Acres was just to see if these fellows ever worked for an honest living."

This judgment must be reversed on another ground hereinafter noted, but it is thought advisable to consider the question whether or not there is substantial evidence of appellant's participation in the conspiracy.

It is true, as stated by appellant's able counsel, that there is no testimony directly connecting appellant with the crime, except that of the defendant Mares, a confessed perjurer, who had been an inmate of two penitentiaries before he engaged in this conspiracy. It is also shown by the motion for a new trial that, after being taken to prison for this crime, he made another affidavit exonerating appellant. Such a record is reviewed with alert consciousness that at least one link in the chain of evidence is decidedly weak.

However, the evidence that some one hired Mares to burn the elevator is convincing. It is also well established that Arellano, who conversed with Mares in his mother tongue, was employed as a go-between. The close and long-continued relation between appellant and Arellano is admitted. It is also admitted that appellant spent the day and evening of June 15, 1933, in Clayton. The failure of appellant to turn over Overbay and Dacy to the officers of the law or to report their efforts to extort money from him may be given some weight, especially in view of his testimony to the effect that he threatened to call the police if they further annoyed him. The telephone calls of Arellano between the time of Mares' and Arellano's visit to Amarillo and June 15th would have been given little consideration if appellant had not denied making them. His testimony as to the obtaining of a

statement from Mares has been quoted. Appellant's conduct in this instance hardly comports with that of·one having no motive except curiosity as to whether "these fellows ever worked for an honest living."

■ The jury heard and saw the witnesses, including Mares, whose thorough cross-examination laid bare his want of character. His two accounts of this crime, each differing on material points from the testimony given at the trial, were also before the jury. Notwithstanding the low rating which must be given Mares' testimony, the facts and circumstances admit of a reasonable inference that appellant participated in the conspiracy charged.

■ The recanting affidavit of Mares was made one of the grounds of appellant's motion for a new trial. The trial court denied the motion, and this is assigned as error. Appellant cites Pettine v. Territory of New Mexico (C.C.A.) 201 F. 489; Powell v. Commonwealth, 133 Va. 741, 112 S.E. 657, 33 A.L.R. 541. Following this case, in 33 A.L.R. at page 550, there is an extended annotation on "statement by witness after criminal trial tending to show that his testimony was perjured as ground for a new trial," and a supplemental annotation in 74 A.L.R. 757. It appears that the great weight of authority supports the rule that a defendant is not entitled to a new trial as a matter of right because a material state's witness recants.

In a leading case, People v. Shilitano, 218 N.Y. 161, 112 N.E. 733, 735, L.R.A. 1916F, 1044, the court of appeals of New York stated:

"At the outset of our task in considering this alleged newly discovered evidence it is necessary to determine whether recantation by witnesses called on' behalf of the people necessarily entitled the defendant to a new trial. The question must be answered in the negative, otherwise the power to grant a convicted defendant a new trial rests not with the court but with the witnesses who testified against him upon , the' trial. People v. Tallmadge, 114 Cal. 427, 46 P. 282. In the case last cited the court said: 'It cannot be said that, as a matter of law, a new trial should be granted whenever an important witness against the defendant shall make an affidavit that he committed perjury in his testimony; if that were so, justice would be defeated in many grave cases. * * * We have no doubt that a case might arise where an important witness had afterward testified to having committed perjury, in which this court would hold, looking at the whole case, that a new trial ought to have been granted.'

"Bearing in mind that the witnesses to crimes of violence are often of a low and degraded character and that after they have given their testimony they are sometimes influenced by bribery and other improper considerations, it is evident that the establishment of a rule which left the power to grant a new trial to a defendant to depend upon recantation by such witnesses would be subversive of the proper administration of justice. I do not wish to

be understood as urging that the fact of recantation is not to be considered by the court in weighing the testimony upon which the defendant was convicted, but I wish to make clear the fact that recantation in and of itself does not necessarily require the court to order a new trial. * * * There is no form of proof so unreliable as recanting testimony. In the popular mind it is often regarded as of great importance. Those experienced in the administration of the criminal law know well its untrustworthy character."

See, also, Larrison et al. v. United States (C.C.A., 7th) 24 F.(2d) 82; State v. Smith, 126 Kan. 670, 271 P. 289; Blass v. People, 79 Colo. 555, 247 P. 177; Tucker v. State, 176 Ark. 1206, 2 S.W.(2d) 61; People v. Lerner et al. (Cal.App.) 53 P. (2d) 194.

The jury had before it the affidavit of Mares obtained by appellant's agent Acres, and this later affidavit which absolved appellant from any connection with the crime could hardly be called newly discovered evidence, since the two affidavits were to the same effect, in that they were contrary to the testimony of Mares connecting appellant with the conspiracy. Great weight should be given the trial court's opinion on a motion for a new trial based upon the affidavit of a recanter, and his decision will not be reversed without clear showing of abuse of discretion, which does not appear in this case. Compare U. S. v. Biena, 8 N.M. 99, 42 P. 70.

The trial court instructed the jury that one of the material allegations of the information necessary to be established was that the burning of the elevator was a felony under the laws of the state of Oklahoma. The state placed upon the stand a member of the bar of the Supreme Court of Oklahoma, who testified that arson was a felony under the statutes of that state, and identified the Compiled Oklahoma Statutes of 1921, which were properly admitted in evidence [Anthony Doll & Co. v. Hogan (N.M.) 53 P.(2d) 649], whereupon the witness was asked:

"Q. What number have you got there, Mr. Becker? A. Beginning with section 2046 to section 2058 inclusive.

"Q. Will you read section 2056 into the record?"

After objection and argument the section was read. "2056. *Degrees of Arson* —arson in the first degree. Arson is divided in two degrees. Arson in the first degree is: First. Maliciously burning in the night time an inhabited building in which there is at the time some human being; or, Second. Maliciously burning in the night time a structure adjoining to or within the curtilage of an inhabited building in which there is at the time some human being, and in such a way that such inhabited building is endangered; or, Third. Maliciously burning in the day time any inhabited building or structure in which merchandising is carried on; or, Fourth. Maliciously burning in the night time any

uninhabited building in which merchandising is carried on, or in which there is at the time any cattle, horses, hogs or sheep. Arson committed in any other way is arson in the second degree."

There is no evidence in the record which would support the classification of this crime as arson in the first degree under this statute; hence it falls under arson in the second degree.

Section 2046 is set out in appellee's brief, and is as follows: "Arson is the wilful and malicious burning of a building, with intent to destroy it."

This section was not read. On cross-examination the state's expert witness testified:

"Q. Burning a building is not a felony under the laws of Oklahoma except under particular conditions, is that correct? A. Certainly.

"Q. And those conditions must be such, if the building is burned, as to conform to the statutory definition of arson? A. Certainly.

"Q. Burning a building is not a felony in Oklahoma unless it conforms to the definition of arson? A. Certainly not.

"Q. And a building might be burned and not be a felony in Oklahoma, is that true? A. Yes, sir."

Appellant maintains that there is a total absence of proof to sustain the allegation of the information that the burning of this elevator was a felony under the laws of Oklahoma.

▬ In the absence of proof to the contrary, the courts of some states presume that the common law prevails in a sister state. People v. Sokol, 226 Mich. 267, 197 N.W. 569, and in California it seems that the court in criminal cases will presume that the laws of sister states are the same as laws of California, People v. Cohen, 71 Cal.App. 367, 235 P. 658; but the Attorney General has made it unnecessary for us to pass upon this question. He quotes in his brief section 2046 of the Oklahoma Compiled Statutes, which appears above. This section does not appear in the transcript and we are unable to consider the law as in evidence because it is quoted in the brief. In re Larsen's Estate, 137 Misc. 271, 242 N.Y.S. 486.

▬ Under the instructions of the court, the testimony of the state's expert, and the definition of arson in the second degree, which is "arson committed in any other way is arson in the second degree," the statutory definition of arson is essential in order to prove a complete crime. No evidence at all was offered in support of this material fact, and regardless of the finding of the jury the judgment must be reversed.

▬ In the trial of this cause the existence of this Oklahoma law was treated as a pure question of fact and submitted to the jury. The better rule is that foreign laws are to be proved as facts by evidence addressed to the court and not the jury. 59 C.J. 1209.

"The better opinion seems to be, that this proof must be made to the Court,.

rather than to the jury. 'For,' observes Mr. Justice Story, 'all matters of law are properly referable to the Court, and the object of the proof of foreign laws is to enable the Court to instruct the jury what, in point of law, is the result of the foreign law to be applied to the matters in controversy before them. The Court are, therefore, to decide what is the proper evidence of the laws of a Foreign country; and when evidence is given of those laws, the Court are to judge of their applicability, when proved, to the case in hand.'" 1 Greenleaf Evidence, § 486.

Other errors claimed require no consideration. For the reason stated, the verdict should be set aside, the judgment reversed, and the cause remanded, with directions to the district court to grant appellant a new trial.

It is so ordered.

SADLER, C. J., and BICKLEY, BRICE, and ZINN, JJ., concur.