36 So.2d 331

### CAMP v. ATLANTIC COAST LINE R. CO.

6 Div. 680.

Supreme Court of Alabama.

June 24, 1948.

Rehearing Denied July 31, 1948.

Taylor, Higgins, Koenig & Windham and J. Howard Perdue Jr., all of Birmingham, for appellant.

Graham, Bibb, Wingo & Foster, of Birmingham, for appellee.

FOSTER, Justice.

The question on this appeal is whether we should reverse the trial court in setting aside a judgment for plaintiff, who is the appellant, complaining of such ruling. .

Plaintiff's intestate, H. L. Camp, was killed on April 13, 1946, while serving defendant as switchman at about 8:30 p. m. The case was tried on counts 1 and A. Count 1 was based on the claim that Camp came to his death by the negligence of the servants, agents or employees of defendant, and is framed to apply to section 51, Title 45 U.S.C.A. (Federal Employers' Liability Act). Count A is founded on a failure to comply with section 23, Title 45 U.S.C.A., commonly known as the Boiler Inspection Act.

The evidence showed without dispute that the movement was of an engine and boxcars in a switching operation. The engine was in front, but was backing, and pulling the cars. The plan was to move in a northwesterly direction, extending across First Avenue, N. (Cotton Ave.), and on to and across Second Ave, N. (or Tuscaloosa Ave.). As it moved there was across the front (which was the rear of the engine) a foot board, to be used by switchmen in performing their duty. The train had been standing just prior to the accident three or four car lengths south of First Ave., N. Camp was an experienced switchman. The city ordinance required that such a movement across the street shall be preceded by a crewman a reasonable distance ahead and shall give the prescribed danger signals. There was indication that Camp was to flag First and Second Avenues on this trip. There was evidence that Camp got on the foot board on the engineer's side, and from there Camp gave the "back up" signal. The train did back up, and when it reached a point about five feet south of First Ave., Camp gave another back up signal. At this time, the engineer (Keller), the foreman (Brunson), who had climbed to the top of a nearby boxcar, could not see Camp standing on the foot board, but could see his hand and lantern as he gave the signals. It should have stopped for him to get off, if he was due to get off, but he gave the back up signal without the train stopping. They did not see him get off the foot board, nor precede the movement across First Avenue. The testimony of one McGill was that he was passing along the north side of First Ave., going east, approaching the train as it crossed that avenue, and that he saw a man ahead of the train with a lantern flagging the train completely across, and after he crossed he turned, and when he started to catch the train his feet hit the "step" board and went out from under him and he fell, and he hollered loud two or three times, but he said that the engineer was picking up speed and making a fuss. That the train was first traveling about seven or eight miles an hour, and then gained speed and did not stop until it came to near Second Ave. The engineer swore his speed across the Avenue was about three miles an hour. None of the crewmen saw Camp or a signal from him after he gave the second back up signal. When the engineer got near Second Ave., he stopped the train for Camp to get off the foot board and flag the crossing, but did not see him get off, and so he got down off the engine to look for him, but did not find him, and then walked back to look for him, and met Brunson, and they went back together and found Camp's body one hundred and twenty to one hundred and seventy-five feet north of First Ave. His head entirely severed

from his body was found there, and both feet also cut off were found forty to seventy feet from First Ave., and between where the feet and body were found some of his small personal effects were picked up.

The defendant contends that there was no necessity to flag this crossing at First Ave., since there was no traffic approaching from either direction; that the train did not stop for Camp to get off to flag the crossing, and if he did get off, none of the crewmen knew of it.

The theory on which negligence is claimed as to count 1 is that good practice required on a movement of that sort, that when a switchman being on the ground should catch the foot board, the engineer customarily brought his train to a stop, or practically so, to allow him to step on the foot board; that Camp flagged the train across First Ave., after which his duty required him to get on the foot board, and that the train should have stopped for him to do so. The train did not stop. The only evidence that he flagged the train across the avenue, and then tried to get on the foot board was that of McGill. Neither the engineer nor the other crewmen, nor anyone else, saw him flagging across, or knew that he was not on the foot board, if he was not. There is evidence that there was no traffic to need flagging. The evidence supports an inference that he was run over forty to seventy feet north of the crossing.

To support count 1, as contended for by plaintiff, the jury must find that Camp had flagged the train across First Ave., and then attempted to step on the foot board, and that the engineer was negligent in not stopping or slowing down the train for him, as was his duty. Of course, that duty did not exist unless the engineer had information that Camp was probably on the ground. The engineer says he did not see him on the ground, and did not know that he was not on the foot board going across First Ave. If he had been flagging across the street ahead of the movement, the engineer, fireman, and the foreman Brunson would probably have seen him. They did not see him according to their evidence. The only person who

claimed to have seen him in such way as to make out a case for plaintiff was McGill.

After the motion for a new trial was made, and after the expiration of thirty days from the date of the judgment, it was attempted to be amended by adding grounds of newly discovered evidence to the effect that McGill had then signed a sworn statement that his testimony was false; that he was not there, and did not see the occurrence, but had so testified at the instance of one Frank Hunter. On motion of plaintiff, the court correctly struck those grounds of the motion. Sorsby v. Wilkerson, 206 Ala. 190, 89 So. 657; Atlantic Coast Line R. Co. v. Burkett, 207 Ala. 344, 92 So. 456; Francis v. Imperial Sanitary Laundry & Dry Cleaning Co., 241 Ala. 327, 2 So.2d 388. They were not germane nor in elaboration of any ground in the motion as filed. Ferrell v. Ross, 200 Ala. 90, 75 So. 466; Ohme v. Bisimanis, 222 Ala. 262, 132 So. 161.

Defendant on hearing the motion, one ground of which was that the verdict was contrary to the great preponderance of the evidence, offered to prove that McGill had thus repudiated his testimony and also that both he and Hunter had been convicted for contempt of court in connection with such testimony of McGill. The court sustained objection to that testimony. We can find no authority to justify a consideration of such evidence under the circumstances, and the court ruled correctly. Massey v. Reynolds, 213 Ala. 178, 104 So. 494; Powell v. Commonwealth, 133 Va. 741, 112 S.E. 657, 33 A.L.R. 541, 550; see, Cooke v. Embry, 219 Ala. 623(15), 123 So. 27; Hodge v. State, 32 Ala.App. 283, 26 So.2d 274(9); 46 Corpus Juris 230, section 186.

It should be noted that no fraud is charged to plaintiff in that connection, nor that he or his counsel had notice of the facts as to the false testimony in using it, if it was false. It is therefore not within the four months statute (Section 279, Title 7, Code).

But the principle of the common law is fully supported in Alabama,

that it is the duty of the trial court on motion to set aside a verdict and grant a new trial if the judge has a definite and well considered opinion from the evidence that the verdict was unjust under the pleadings. And because the trial court saw and heard the witnesses, presumption is indulged in favor of its ruling granting or refusing a new trial. Schaeffer v. Walker, 241 Ala. 530, 3 So.2d 405; Parker v. Hayes Lumber Co., 221 Ala. 73, 127 So. 504; Batson v. State, 216 Ala. 275, 113 So. 300; Cobb v. Malone, 92 Ala. 630, 9 So. 738. And that if the court grants a new trial on the ground that the verdict is contrary to the great weight of the evidence, or that the verdict is unjust on the basis of the evidence, the court on appeal will not reverse unless the evidence plainly and palpably supports the verdict. Williams v. Birmingham Water Works Co., 230 Ala. 438, 162 So. 95; Lindsay Products Corp. v. Alabama Securities Corp., 247 Ala. 662, 25 So.2d 852; Schaeffer v. Walker, supra; Parker v. Hayes Lumber Co., supra.

In granting the motion for a new trial, the trial court expressed no opinion and assigned no ground which he thought justified his ruling. We will therefore indulge the presumption that it was because he thought the verdict was contrary to the great preponderance of the evidence, or that the verdict was unjust in the light of the evidence. He saw McGill and the manner of his testimony, and had a better chance to appraise it than we have. We cannot presume that he was influenced by the subsequent occurrences relating to his testimony, which he excluded, although the contempt charge was before the same judge.

Count A, as we have said, was based on a violation of what is called the Boiler Inspection Act of Congress. It requires an inspection from time to time of the locomotive, boiler, tender and all parts and appurtenances of the locomotive, and provides that it must withstand the prescribed tests, and be in proper condition, and safe to operate in the service to which the same is put. This duty is absolute, and its failure of observance proximately causing the death is actionable under the Federal Employers' Liability Act, whether or not there is actual negligence. Atlantic Coast Line R. Co. v. Wetherington, 245 Ala. 313, 16 So. 2d 720; Lilly v. Grand Trunk Western R. Co., 317 U.S. 481, 63 S.Ct. 347, 87 L. Ed. 411.

If the locomotive or any of its appurtenances is dangerous, and unsafe to operate in the service to which it is put, either because of mechanical defects or because of the presence of dangerous objects or foreign matter, and such dangerous condition is the proximate cause of the death of an employee, the Act fixes liability without other requirements. Baltimore & O. R. Co. v. Groeger, 266 U.S. 521, 45 S.Ct. 169, 69 L.Ed. 419; Lilly v. Grand Trunk Western R. Co., supra.

As we understand the Boiler Inspection Act, as interpreted by the federal courts, it means that if the locomotive and all its appurtenances are safe to operate when operation began, but during such operation and by reason thereof, some unsafe condition arose it sometimes follows, but not always, that the continued use of the locomotive violates the Act. Erie R. Co. v. Lindquist, 3 Cir., 27 F.2d 98; Reeves v. Chicago, St. Paul, M. & O. R. Co., 147 Minn. 114, 179 N.W. 689. An unsafe condition by allowing grease to get on a hand hold and become slick and dangerous, occurring during the operation, has been held not to support a claim under this Act. Ford v. New York, N. H. & H. R. Co., 2 Cir., 54 F.2d 342. This decision was rendered by the Second Circuit Court of Appeals before the Lilly case, supra. The Lilly case, supra, seems to support the view that the unsafe conditions there occurring during operation of the engine came under its provisions. But that case gave application to a rule made by the Interstate Commerce Commission under authority of that Act, which required the top of the tender behind the fuel space to be kept clean. The injury resulted from ice forming on that part of the tender. There is no rule of the Interstate Commerce Commission here applicable.

In our case of Alabama Great Southern R. Co. v. Baum, 249 Ala. 442, 31 So.

2d 366, there was ice formed on an engine step because of a mechanical defect in the locomotive.

The United States Supreme Court does not seem to have considered a case such· as this, and the Ford case, supra, where there was applicable no rule made by the Interstate Commerce Commission, and the condition was not created by a mechanical defect in the locomotive, and did not exist when the operation began.

We do not think the Act should or will be construed to apply to the facts of this case without such a rule, where the foot board was free from grease when inspected just before the engine started on this service, and there is no evidence of when or how it came to be there, if at all. It was a disputed issue on conflicting evidence, as to whether it was there at all. It could have been that Camp's feet picked up and deposited it there, if it was there. It is purely speculative as to when or how it got there. While this Act makes absolute a duty which before only required due care, we think we should hold, as in the Ford case, supra, until better advised, that it was not intended to apply to a dangerous condition of the engine or its parts, not caused by a mechanical defect, and not violative of a rule or regulation prescribed under the Act, but which occurred as a result of normal operations.

A verdict cannot rest on speculation or conjecture. We think the affirmative charge should have been given at defendant's request as to count A. The evidence does not show that there was such a defective condition in the locomotive or any of its parts or appurtenances as to make it improper or unsafe to operate in the service to which it was put on that occasion, as contemplated by the Boiler Inspection Act. So that the trial court was not in error in setting aside a verdict which might be attributed to count A. We do not think it is necessary to consider the other matters discussed on the direct appeal. Those involved in the cross assignments are controlled by the principles we have discussed.

Affirmed.

.All the Justices concur.