853 So.2d 171 (2002)
GENERAL MOTORS CORPORATION
v.
Charles W. KILGORE et al.
1002149.
Supreme Court of Alabama.
December 20, 2002.
*172 Frank E. Lankford, Jr., of Huie, Fernambucq & Stewart, L.L.P., Birmingham, for appellant.
Martin K. Berks of Environmental Attorneys Group, L.L.C., Birmingham, for appellees.
BROWN, Justice.
General Motors Corporation ("GMC") appeals from the Colbert Circuit Court's denial of its motion for a summary judgment in this wrongful-death action. This Court granted GMC's petition for a permissive appeal pursuant to Rule 5, Ala. R.App. P. We reverse the summary judgment and render a judgment for GMC.

*173 I. Factual Background and Procedural History

On June 11, 1999, Charles W. Kilgore and Sandra Kilgore Holmes, as coexecutors of the estate of their father, William Austin Kilgore (hereinafter referred to as "decedent"), and Kathyrine E. Kilgore, individually and as the dependent widow of the decedent (hereinafter collectively referred to as the "Kilgores"), filed a wrongful-death action against GMC in the Colbert Circuit Court. The Kilgores alleged that the decedent, who died on June 12, 1997, of mesothelioma as a result of exposure at his workplace to products containing asbestos manufactured by GMC. Specifically, the Kilgores claim that GMC breached its duty under the Alabama Extended Manufacturer's Liability Doctrine (hereinafter "the AEMLD")[1] to provide reasonably safe products and that it breached its duty to inform the decedent of the hazards of exposure to asbestos.
The Kilgores' claims are based on the decedent's alleged exposure to asbestos products during his employment with Norfolk Southern Railroad Company from 1941 through 1983. The Kilgores maintain that while he was employed with Norfolk Southern the decedent was exposed to asbestos-containing components of locomotives manufactured by GMC.
GMC moved for a summary judgment on the ground that the Kilgores' claims were preempted by the Federal Locomotive Inspection Act ("FLIA").[2] The trial court denied the motion for a summary judgment. In accordance with Rule 5(a), Ala. R.App. P., we granted GMC permission to appeal the trial court's denial of summary judgment.

II. Standard of Review
"We review this case de novo, applying the oft-stated principles governing appellate review of a trial court's grant or denial of a summary judgment motion:
"`We apply the same standard of review the trial court used in determining whether the evidence presented to the trial court created a genuine issue of material fact. Once a party moving for a summary judgment establishes that no genuine issue of material fact exists, the burden shifts to the nonmovant to present substantial evidence creating a genuine issue of material fact. "Substantial evidence" is "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." In reviewing a summary judgment, we view the evidence in the light most favorable to the nonmovant and entertain such reasonable inferences as the jury would have been free to draw.'"
American Liberty Ins. Co. v. AmSouth Bank, 825 So.2d 786, 790 (Ala.2002) (quoting Nationwide Prop. & Cas. Ins. Co. v. DPF Architects, P.C., 792 So.2d 369, 372 (Ala.2000) (citations omitted)).

*174 III. The FLIA's Preemption of the Kilgores' Claims

GMC contends that the Kilgores' claims are preempted by federal law. Thus, we must determine whether the FLIA preempts state common-law claims against a locomotive manufacturer. In United Transportation Union v. Foster, 205 F.3d 851 (5th Cir.2000), the United States Court of Appeals for the Fifth Circuit succinctly laid out the general principles of preemption. The court stated:
"The Supremacy Clause of Article VI of the United States Constitution provides Congress with the power to preempt state law. See U.S. Const. art VI, cl. 2. The Supreme Court has instructed federal courts that the historic police powers of the states are not to be superceded by federal law unless `that was the clear and manifest purpose of Congress.' Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947). In Louisiana Public Service Commission v. FCC, 476 U.S. 355, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986), the Supreme Court detailed the circumstances when a finding of preemption is appropriate:
"`Preemption occurs when Congress, in enacting a federal statute, expresses a clear intent to preempt state law, when there is outright or actual conflict between federal and state law, where compliance with both federal and state law is in effect physically impossible, where there is implicit in federal law a barrier to state regulation, where Congress has legislated comprehensively, thus occupying an entire field of regulation and leaving no room for the states to supplement federal law, or where the state law stands as an obstacle to the accomplishment and execution of the full objectives of Congress. Preemption may result not only from action taken by Congress itself; a federal agency acting within the scope of its congressionally delegated authority may preempt state regulation.'
"476 U.S. at 368-69, 106 S.Ct. 1890 (citations omitted). In any case, `[t]he critical question is whether Congress intended that federal regulations supersede state law.' Id. at 369, 106 S.Ct. 1890."
205 F.3d at 859 (emphasis added).
With regard to the FLIA, we note that "promotion of national uniformity in locomotive-safety regulation was ... one of the primary goals of the FLIA and its predecessor, the Boiler Inspection Act." Norfolk Southern Ry. v. Benson, 774 So.2d 549, 553 (2000). Moreover, "[i]t has long been settled that Congress intended federal law to occupy the field of locomotive equipment and safety, particularly as it relates to injuries suffered by railroad workers in the course of their employment." Law v. General Motors Corp., 114 F.3d 908, 910 (9th Cir.1997) (emphasis added).
As this Court noted in Denson, supra, the seminal case establishing the FLIA's preemptive effect is Napier v. Atlantic Coast Line R.R., 272 U.S. 605, 47 S.Ct. 207, 71 L.Ed. 432 (1926). In Napier, the United States Supreme Court addressed "whether the Boiler Inspection Act ... occupied the field of regulating locomotive equipment used on a highway of interstate commerce, so as to preclude state legislation." 272 U.S. at 607, 47 S.Ct. 207. Napier involved two appeals for actions challenging a Georgia statute that required that fire boxes on locomotives be equipped with an automatic door and a Wisconsin statute that required locomotives to have a cab curtain. Locomotive carriers sought to enjoin state officials from enforcing a state law that prohibited the use within that state of locomotives not equipped with *175 the prescribed devices. See 272 U.S. at 607-08, 47 S.Ct. 207.
In Napier, the Supreme Court noted that in 1911 when it was originally enacted the Boiler Inspection Act ("BIA") applied only to locomotive boilers. However, in 1915 the provisions of the BIA were extended to "`include the entire locomotive and tender and all parts and appurtenances thereof.'" 272 U.S. at 608, 47 S.Ct. 207. In addition, the Supreme Court noted that Congress had given regulatory power over locomotives and their equipment conferred under the BIA to the Interstate Commerce Commission and that the Commission had not imposed any regulations requiring either of the safety devices prescribed by the state statutes.[3]Id. The Court acknowledged that the devices required to be placed on locomotives by the Georgia and Wisconsin statutes were primarily for the safety and health of the locomotive operators, but held that the requirements came within the scope of the authority delegated to the commission. See 272 U.S. at 612-13, 47 S.Ct. 207. The Court held: "The fact that the Commission has not seen fit to exercise its authority to the full extent conferred, has no bearing upon the construction of the act delegating the power.... [T]he Boiler Inspection Act... was intended to occupy the field.... [R]equirements by the states are precluded, however commendable ... their purpose." 272 U.S. at 613, 47 S.Ct. 207. Ten years later, the Supreme Court again discussed the scope of the BIA, stating that it encompasses "[w]hatever in fact is an integral or essential part of a completed locomotive, and all parts or attachments definitely prescribed by lawful order of the [Secretary of Transportation]." Southern Ry. v. Lunsford, 297 U.S. 398, 402, 56 S.Ct. 504, 80 L.Ed. 740 (1936); see also Oglesby v. Delaware & Hudson Ry., 180 F.3d 458, 461 (2d Cir.1999).
Later, in Law v. General Motors Corp., supra, the United States Court of Appeals for the Ninth Circuit held that state common-law actions against locomotive manufacturers were preempted under the FLIA. In explaining the effect of FLIA preemption on state common-law actions, the court stated:
"This broad preemptive sweep is necessary to maintain uniformity of railroad operating standards across state lines. Locomotives are designed to travel long distances, with most railroad routes wending through interstate commerce. The virtue of uniform national regulation `is self-evident: locomotive companies need only concern themselves with one set of equipment regulations and need not be prepared to remove or add equipment as they travel from state to state.' ... Any state law that undermines this regime is preempted by the BIA.
"... [C]ommon-law claims fall squarely within this preempted field. Apart from compensating victims of accidents for their injuries, the purpose of tort liability is to induce defendants to conform their conduct to a standard of care established by the state."
Law, 114 F.3d at 910. The court then explained why FLIA preemption applies not only to common-law actions against locomotive operators, but also to common-law actions against locomotive manufacturers:
"A railroad equipment manufacturer found to have negligently designed a *176 braking system ... is expected to modify that system to reduce the risk of injury. If the manufacturer fails to mend its ways, its negligence may be adjudged willful in the next case, prompting a substantial punitive damages award. If each state were to adopt different liability-triggering standards, manufacturers would have to sell locomotives and cars whose equipment could be changed as they crossed state lines, or adhere to the standard set by the most stringent state. Either way, Congress's goal of uniform, federal railroad regulation would be undermined.
"....
"Appellants nevertheless argue that their claims are not preempted because they are directed against railroad manufacturers, not operators. This distinctionfounded on the fact that the BIA speaks only to `railroad carrier[s]' and not manufacturers,is without significance. The BIA preempts any state action that would affect `the design, the construction, and the material' of locomotives. Imposing tort liability on railroad equipment manufacturers would do just that, by forcing them to conform to design and construction standards imposed by the states. This would transfer the regulatory locus from the Secretary of Transportation to the state courtsa result the BIA was clearly intended to foreclose."
Law, 114 F.3d at 910-12 (citations and footnote omitted).
A majority of courts have followed the reasoning articulated by the Ninth Circuit Court of Appeals and have also found that the FLIA preempts common-law actions against both locomotive operators and locomotive manufacturers. See Forrester v. American Dieselelectric, Inc., 255 F.3d 1205 (9th Cir.2001) (following the holding in Law, supra, that the BIA preempts product-liability actions against a manufacturer of locomotive cranes); Oglesby v. Delaware & Hudson Ry., 180 F.3d 458 (2d Cir.1999) (the BIA applies to manufacturers of component parts of locomotives and preempts common-law remedies); Springston v. Consolidated Rail Corp., 130 F.3d 241 (6th Cir.1997) (the BIA preempts state-law negligence claims based upon the alleged failure to provide adequate warning devices on trains); see also Roth v. I & M Rail Link, L.L.C., 179 F.Supp.2d 1054 (S.D.Iowa 2001) (state common-law tort claims against manufacturer of locomotive parts are within the field preempted by the FLIA); Bell v. Illinois Central R.R., 236 F.Supp.2d 882 (N.D.Ill.2001)(same); In re: Amtrak "Sunset Limited" Train Crash in Bayou Canot, Alabama, on September 22, 1993, 188 F.Supp.2d 1341 (S.D.Ala.1999) (common-law negligence and design-defect claims are preempted by the BIA); Scheiding v. General Motors Corp., 22 Cal.4th 471, 993 P.2d 996, 93 Cal.Rptr.2d 342 (2000) (product-liability actions against a manufacturer of locomotives containing asbestos materials were preempted under the FLIA); Seaman v. A.P. Green Indus., Inc., 184 Misc.2d 603, 707 N.Y.S.2d 299 (Sup.Ct.2000) (same). But see Lorincie v. Southeastern Pennsylvania Transp. Auth., 34 F.Supp.2d 929 (E.D.Pa.1998) (the BIA does not preempt common-law claims against railroad manufacturers that are not also carriers).
We agree with the reasoning of the Ninth Circuit Court of Appeals and with the supporting authority cited above, and we hold that the FLIA governs the Kilgores' state-law causes of action. Thus, the Kilgores' claims are preempted.
The Kilgores argue that in light of Cipollone v. Liggett Group, Inc., 505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992), Medtronic, Inc. v. Lohr, 518 U.S. 470, 116 S.Ct. 2240, 135 L.Ed.2d 700 *177 (1996), and Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984), the preemption of the FLIA in the field as set forth in Napier has been narrowed.[4]Cipollone and Medtronic involve two narrowly tailored express statutory preemption clauses and do not involve preemption in an entire field. In Cipollone, the United States Supreme Court examined whether the Federal Cigarette Labeling and Advertising Act[5] preempted state-law tort claims against manufacturers for failing to warn consumers about the hazards of smoking. An earlier version of the statute preempted only state laws respecting "statements" and "advertising." Id. at 518, 112 S.Ct. 2608. It did not preempt state common-law claims because the preemption clause was narrowly tailored. However, the statute was later revised to include a clause that preempted any "requirement or prohibition" respecting smoking and health. The Supreme Court held that the phrase "requirement or prohibition" "sweeps broadly and suggests no distinction between positive enactments and common law; to the contrary, those words easily encompass obligations that take the form of common-law rules." 505 U.S. at 521, 112 S.Ct. 2608 (opinion of four Justices), 548-49, 112 S.Ct. 2608 (Scalia, J., agreeing on this point).
Medtronic involved an express preemption provision contained in the Medical Device Amendments of 1976 ("MDA"). Construing the provision according to its terms, the Court found no congressional intent to deny all state common-law negligence actions against manufacturers of medical devices. The Court noted that if Congress did indeed intend such a result, its failure to so state in the MDA was particularly odd because both Houses of Congress were aware of the ongoing product-liability litigation. See 518 U.S. at 491, 116 S.Ct. 2240. "Unlike the statute construed in Cipollone [v. Liggett Group, Inc., 505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992),] for instance, pre-emption under the MDA does not arise directly as a result of the enactment of the statute; rather, in most cases a state law will be pre-empted only to the extent that the FDA has promulgated a relevant federal `requirement.'" 518 U.S. at 496, 116 S.Ct. 2240.
The Kilgores argue that, construed together, Cipollone and Medtronic "establish that even if there is an express statutory provision mandating pre-emption of state law, that provision will be narrowly construed and state law tort actions will not be pre-empted unless they specifically conflict with the federal statute containing the pre-emption provision." Kilgores' brief at 37. However, Cipollone and Medtronic involve express preemption clauses. The Supreme Court, on the other hand, has determined that the FLIA occupies the field of locomotive equipment; hence, any "requirements by the states are precluded, however commendable or however different their purpose." Napier, 272 U.S. at 613, 47 S.Ct. 207. Therefore, in dealing *178 with the FLIA, narrowness is not an issue; the FLIA preempts the entire field. Law, 114 F.3d at 910; Oglesby, 180 F.3d at 460-62; Scheiding, 22 Cal.4th at 483-84, 993 P.2d at 1004, 93 Cal.Rptr.2d at 351.
In addition, the Kilgores, citing Cipollone and Medtronic, argue that there is a presumption against preemption when Congress has "legislated ... in a field which the States have traditionally occupied." Medtronic, 518 U.S. at 485, 116 S.Ct. 2240. This argument is without merit. "Railroads have been subject to comprehensive federal regulation for nearly a century.... There is no comparable history of longstanding state regulation ... of the railroad industry." United Transp. Union v. Long Island R.R., 455 U.S. 678, 687-88, 102 S.Ct. 1349, 71 L.Ed.2d 547 (1982)(footnote omitted). Thus, "an `assumption' of non-pre-emption is not triggered when the State regulates in an area where there has been a history of significant federal presence." United States v. Locke, 529 U.S. 89, 108, 120 S.Ct. 1135, 146 L.Ed.2d 69 (2000).
The Kilgores argue that under Silkwood, supra, even if an entire field is preempted, only state regulationnot state tort lawis preempted. In Silkwood, the United States Supreme Court held that the Atomic Energy Act did not preempt state-law tort actions, but its holding was based on the fact that the Court could find no intent in the overall statutory scheme of the Atomic Energy Act to preclude a punitive-damages award under the Act. 464 U.S. at 250-55, 104 S.Ct. 615.
Unlike the Atomic Energy Act, the FLIA "`contains no evidence Congress assumed or intended state remedies for design defects would be preserved.'" Scheiding, 22 Cal.4th at 479-80, 993 P.2d at 1001, 93 Cal.Rptr.2d at 348 (quoting Carrillo v. ACF Indus., Inc., 20 Cal.4th 1158, 1168-69, 980 P.2d 386, 393, 86 Cal.Rptr.2d 832, 840 (1999)). In addition, as the Scheiding court pointed out,
"unlike the situation in Silkwood [v. Kerr-McGee Corp., 464 U.S. 238, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984)], the field occupied by the BIA must necessarily extend to state law tort recovery. That is, the BIA cannot remove `the design, the construction, and the material of every part of the locomotive and tender and of all appurtenances' from the purview of state regulation without concomitantly precluding tort actions premised on a defect in such design, construction, or material. Any other result would place regulation of these requirements in the hands of state juries, thereby constraining the Secretary of Transportation's regulatory authority and undermining the goal of uniformity."
22 Cal.4th at 479, 993 P.2d at 1001-02, 93 Cal.Rptr.2d at 347 (citations omitted). We agree with the above analysis, and we reject the Kilgores' claim that the field of the FLIA's preemption has been narrowed.
The Kilgores next contend that FLIA preemption is proper only if a federal regulation covering the disputed issue exists and, in the absence of such a federal regulation, state-law tort claims are not precluded. We disagree. "[T]he power delegated to the Commission by the [BIA] as amended is a general one. It extends to the design, the construction, and the material of every part of the locomotive and tender and of all appurtenances." Napier, 272 U.S. at 611, 47 S.Ct. 207. Because the United States Supreme Court has determined that the FLIA occupies the entire field, there is no area within which the states may regulate. See Oglesby, 180 F.3d at 462; Springston, 130 F.3d *179 at 244-45; Scheiding, 22 Cal. 4th at 481, 993 P.2d at 1002-03, 93 Cal.Rptr.2d at 349.
The fact that FLIA does not explicitly regulate asbestos does not affect our decision today. Congress intended for the FLIA to occupy the entire field; thus the Secretary of Transportation has the discretion to regulate those areas he or she so chooses. "`"[T]he will of Congress upon the whole subject is as clearly established by what it had not declared, as by what it has expressed."`" Scheiding, 22 Cal.4th at 481, 993 P.2d at 1003, 93 Cal.Rptr.2d at 350 (quoting Southern. Ry. v. R.R. Com. of Indiana, 236 U.S. 439, 447, 35 S.Ct. 304, 59 L.Ed. 661 (1915)). In fact, the Secretary of Transportation, through the Federal Railroad Administration ("the FRA"), has addressed the asbestos issue and has determined that it requires no regulation at this time.[6]
The Kilgores' assertion that Napier is limited only to preemption of state legislation regulating locomotives, not common-law tort remedies, is also without merit. See Napier, 272 U.S. at 607, 613, 47 S.Ct. 207. The United States Supreme Court has declined to find such a distinction:
"Our concern is with delimiting areas of conduct which must be free from state regulation if national policy is to be left unhampered. Such regulation can be as effectively exerted through an award of damages as through some form of preventive relief. The obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy. Even the States' salutary effort to redress private wrongs or grant compensation for past harm cannot be exerted to regulate activities that are potentially subject to the exclusive federal regulatory scheme."
San Diego Building Trades Council v. Garmon, 359 U.S. 236, 246-47, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959); see also Law, 114 F.3d at 910-11.
The Kilgores next argue that Congress's enactment of the Federal Railroad Safety Act, 49 U.S.C. § 20101 et seq., in 1970 altered the preemptive effect of the FLIA. We disagree. This same argument was addressed and rejected in Consolidated Rail Corp. v. Pennsylvania Pub. Utility, 536 F.Supp. 653 (E.D.Penn.1982), aff'd, 696 F.2d 981 (3d Cir.1982), aff'd, 461 U.S. 912, 103 S.Ct. 1888, 77 L.Ed.2d 280 (1983). In Consolidated Rail, the plaintiff railroad company challenged a Pennsylvania statute, contending that the FLIA preempted a state regulation requiring locomotives to have speed recorders and speed indicators. 536 F.Supp. at 654. The state countered with the argument that when Congress enacted the FRA, it "redistributed railroad regulatory authority so that the total-preemption test of the [FLIA] is no longer valid." 536 F.Supp. at 654. In rejecting the state's argument and finding Napier controlling, the court noted that Congress could have repealed or recodified the *180 FLIA; instead, it determined that the FLIA was working well and decided to keep it in force without any changes. 536 F.Supp. at 655-56. Therefore, Consolidated Rail negated any implied modification of any part of the FLIA, "including its total occupation of the locomotive-equipment field." 536 F.Supp. at 656 (footnote omitted).
On appeal, the United States Supreme Court summarily affirmed the Court of Appeals' decision. See Pennsylvania Public Utility Com. v. Consolidated Rail Corp., 461 U.S. 912, 103 S.Ct. 1888, 77 L.Ed.2d 280 (1983). "Such summary actions `should ... be understood ... as applying principles established by prior decisions to the particular facts involved.' (Mandel v. Bradley (1977) 432 U.S. 173, 176, 97 S.Ct. 2238, 53 L.Ed.2d 199). We thus have strong, if indirect, evidence Napier continues to control with respect to the scope of BIA preemption." Scheiding, 22 Cal.4th at 478, 993 P.2d at 1000, 93 Cal.Rptr.2d at 346.
Finally, the Kilgores argue that FLIA preemption is not applicable to this case, because in Camp v. Atlantic Coast Line R.R., 251 Ala. 184, 36 So.2d 331 (1948), this Court held that the FLIA covers only mechanical defects and violations of regulations. However, as GMC has pointed out, Camp did not involve the FLIA's preemption, but rather concerned a railroad's duty to inspect and maintain a locomotive. 36 So.2d at 335. Therefore, Camp is distinguishable from the instant case.

IV. Conclusion
The Kilgores' claims are preempted under the FLIA. Therefore, we reverse the trial court's judgment and render a judgment for GMC.
REVERSED AND JUDGMENT RENDERED.
HOUSTON, SEE, LYONS, HARWOOD, WOODALL, and STUART, JJ., concur.
MOORE, C.J., and JOHNSTONE, J., dissent.
JOHNSTONE, Justice (dissenting).
In 1970, long after the United States Supreme Court decided Napier v. Atlantic Coast Line R.R., 272 U.S. 605, 47 S.Ct. 207, 71 L.Ed. 432 (1926), Congress adopted 49 U.S.C.S. § 20106 as part of the Federal Railroad Safety Act. That statutory provision, as last amended, reads:
"Laws, regulations, and orders related to railroad safety shall be nationally uniform to the extent practicable. A State may adopt or continue in force a law, regulation, or order related to railroad safety until the Secretary of Transportation prescribes a regulation or issues an order covering the subject matter of the State requirement. A State may adopt or continue in force an additional or more stringent law, regulation, or order related to railroad safety when the law, regulation, or order
"(1) is necessary to eliminate or reduce an essentially local safety hazard;
"(2) is not incompatible with a law, regulation, or order of the United States Government; and
"(3) does not unreasonably burden interstate commerce." (Emphasis added.)
The Secretary of Transportation has not "prescribe[d] a regulation or issue[d] an order covering" the use of asbestos in locomotives. Therefore, federal law does not preempt this field, and this Court may recognize a claim against a locomotive manufacturer for tortiously including asbestos *181 in the locomotives manufactured by that manufacturer.
NOTES
[1] The AEMLD is a doctrine of products liability that imposes on manufacturers "the duty to design and manufacture a product that is reasonably safe for its intended purpose and use." Townsend v. General Motors Corp., 642 So.2d 411, 415 (Ala.1994).
[2] The FLIA, 49 U.S.C. §§ 20701-20903, originally pertained only to locomotive boilers and was referred to as the Boiler Inspection Act. The law was later amended to apply to all locomotive parts. Napier v. Atlantic Coast Line R.R., 272 U.S. 605, 608, 47 S.Ct. 207, 71 L.Ed. 432 (1926). Some courts still refer to the FLIA as the Boiler Inspection Act or the Locomotive Boiler Inspection Act. See, e.g., Law v. General Motors Corp., 114 F.3d 908 (9th Cir. 1997).
[3] The Secretary of Transportation now holds this regulatory power. The Secretary, acting through the Federal Railroad Administration, is responsible for the administration and enforcement of railroad-safety laws, including the FLIA. See 49 U.S.C. § 103, § 20103(a); 49 C.F.R. § 1.49(c)(5) (2001).
[4] In reviewing this argument, this Court notes the Supreme Court's warning that

"[i]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals [and state courts applying federal law] should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."
Rodriguez de Quijas v. Shearson/American Express, Inc., 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989).
[5] Enacted in 1965, the Federal Cigarette Labeling and Advertising Act was subsequently incorporated into the Public Health Cigarette Smoking Act of 1969 and codified at 15 U.S.C. § 1331 et seq.
[6] In a 1996 report to Congress, the FRA stated:

"[The] FRA has reviewed ... the known health and safety effects of asbestos exposure, and contacted ... locomotive manufacturers regarding the ... use of asbestos in the construction of locomotives ... [T]here is no evidence that the presence of asbestos poses a problem to humans or the environment. [The] FRA does not feel that further action with respect to the presence of asbestos in locomotive cabs is warranted at this time."
Federal Railroad Administration, U.S. Dep't of Transportation, Rep. to Congress, Locomotive Crashworthiness and Cab Working Conditions (Sept. 1996) at 10-12. Moreover, the FRA "recommend[ed] no action be taken on the issue of asbestos in locomotives" and it "could find no evidence of asbestos being a health problem for crews of older locomotives." Id. at 12-9.